[Civ. No. 3147. Third Appellate District.—November 26, 1926.]

EMIL OFFEMAN, Respondent, v. ROBERTSON–COLE STUDIOS, INC. (a Corporation), Appellant.

[1] CONTRACTS—BREACH—LOSS—INSUFFICIENT PLEADING.—In an action to recover for breach of a contract of employment, where the complaint alleges, in substance, that plaintiff was to dispose of his interest in a certain corporation and that defendant was to reimburse him for any loss sustained thereby and, also, that defendant agreed to reimburse plaintiff for any loss he might suffer in the sale of his furniture, but there is neither allegation nor proof that plaintiff disposed of his interest in said corporation, and the complaint does not allege that plaintiff sustained any loss in the sale of his furniture, or even that he sold the furniture, the complaint does not state a cause of action as to those items.

[2] CORPORATIONS — IDENTITY WITH STOCKHOLDERS—FRAUD—EQUITY.— When necessary to redress fraud, protect the rights of third persons, or to prevent a palpable injustice, the law and equity will intervene and cast aside the legal fiction of independent corporate existence, as distinguished from those who hold and own the corporate capital stock, and deal with the corporation and stockholders as identical entities with identical duties and obligations.

[3] ID. — KNOWLEDGE OF PRESIDENT — NOTICE TO CORPORATION — PRESUMPTION.—Where the president of a corporation is fully informed

---

2. See 6 Cal. Jur. 591; 7 R. C. L. 27.

3. See 6 Cal. Jur. 1116.

of the oral contract under which services are being performed for the corporation, it is his duty to report such information .to the corporation, and the presumption is that he does so and that the corporation is fully informed of the terms of the employment.

[4] CONTRACTS — STATUTE OF FRAUDS — ORAL AGREEMENT — VALIDITY UNTIL VOIDED.—An oral contract of employment which is not to be performed within one year from the making thereof, although unenforceable under the provisions of section 1624 of the Civil Code and section 1973 of the Code of Civil Procedure, is not void, but is as effective as to all the purposes for which it has been made as is such an agreement whose terms have been committed to writing, until its enforcement is voided upon the ground that it is not in writing.

[5] ID. — EVIDENCE — REASONABLE VALUE OF SERVICES. — An oral contract of employment, though unenforceable because not reduced to writing and not admissible for the purpose of finding a claim thereon is admissible in evidence (as an admission against interest) to prove the reasonable value of the services performed thereunder and, in the absence of -other evidence on the subject, this value may be fairly assumed at what was stipulated in the oral contract.

[6] ID. — ESTOPPEL — BREACH — ELECTION OF REMEDIES — REASONABLE VALUE — JUDGMENT — INTEREST. — Where a corporation is estopped to deny the validity of an oral contract of employment, upon a breach thereof by the. corporation the employee is entitled to recover the contract price for services performed and, also, such damages, if any, as he has suffered by reason of the breach, or he may treat the contract as rescinded by such breach and recover the reasonable value of the services performed, but he cannot recover on both theories, or partly on the one and partly on the other; but where the corporation is not so estopped, said employee may recover the reasonable value of the services performed by him, and in that event he is not entitled to interest prior to judgment.

[7] ID.—CHANGE OF RESIDENCE—LOSS—PRESUMPTION—ESTOPPEL—EVIDENCE.—There is no presumption that one suffers a loss by changing his place of residence from New York to Los Angeles; and in this action to recover for the breach of an oral contract of employment, neither the evidence relating to the alleged loss of plaintiff's New York business nor the testimony that he

4.  See 12 Cal. Jur. 922.

sustained a loss in the sale of his furniture in New York was sufficient to prove an estoppel of the defendant corporation to deny the validity of the contract of employment.

(1) 39 C. J., p. 97, n. 86, p. 104, n. 96.   (2) 14 C. J., p. 61, n. 78. (3) 14a C. J., p. 94, n. 99 New, p. 482, n. 95, p. 484, n. 97, p. 485, n. 3.   (4) 27 C. J., p. 186, n. 68, p. 310, n. 4, p. 312, n. 8.   (5) 27 C. J., p. 366, n. 96, p. 380, n. 58.   (6) 27 C. J., p. 338, n. 64, p. 358, n. 22, p. 363, n. 54, p. 364, n. 58; 33 C. J., p. 211, n. 11, p. 212, n. 12.   (7) 4 C. J., p. 1138, n. 63; 21 C. J., p. 1252, n. 93; 22 C. J., p. 308, n. 66, 67, 68; 27 C. J., p. 379, n. 40; 39 C. J., p. 101, n. 64 New.

APPEAL from a judgment of the Superior Court of Los Angeles County. L. H. Valentine, Judge. Reversed, unless partial release and dismissal filed.

The facts are stated in the opinion of the court.

Loeb, Walker & Loeb for Appellant.

Bicksler, Smith & Parke for Respondent.

FINCH, P. J.—This is an appeal by the defendant from the judgment entered in the trial court in favor of the plaintiff.   The complaint alleges:

"That on or about February 14th, 1922, defendant, through its duly authorized agents, entered into a contract with plaintiff, whereby, in consideration that plaintiff immediately dispose of and/or give up his household goods and/or personal effects in and about the City of New York and dispose of his interest in the Reol Productions, Inc., controlled by plaintiff, at whatever loss sustained by plaintiff, by disposing of, or giving up his household goods and/or personal effects, and said business, and become General Manager of Robertson-Cole Studios, Inc., in the County of Los Angeles, State of California, for a period of three years, beginning February 14th, 1922, and ending February 14th, 1925, defendant would compensate plaintiff as follows:

"(1) Pay to plaintiff the sum of $500.00 per week, payable at the end of each and every week, for and during said entire period beginning February 4th, 1922, to and including February 4th, 1925.

"(2) To issue and/or cause to be issued to plaintiff ten thousand shares of Class 'B' common stock, of the par value of Ten Dollars each, in the R-C Pictures Corporation, upon and at the time of the entry of the employment by plaintiff of defendant pursuant to said contract.

"(3) To compensate and reimburse plaintiff for any loss sustained by plaintiff by the sale and disposal of his household goods and/or personal effects, his interest in said Reol Productions, Inc.; to pay the expenses of himself and family from New York to the City of Los Angeles, California, and return; to pay the purchase price of a house of reasonable value for plaintiff in or about Los Angeles, California, to be deeded to plaintiff and become plaintiff's sole property; and, further, to provide and pay to plaintiff for suitable living accommodations in and about the City of Los Angeles, California, until such time as said realty should be purchased for plaintiff by defendant.

"(4) To pay for and furnish plaintiff with reasonable and suitable household furnishings and furniture, to become the sole property of plaintiff, at or about the City of Los Angeles, California.

"(5) That a written contract would be forthwith entered into by and between plaintiff and defendant for said period of three years, and upon the consideration hereinbefore set forth. . . .

"That confiding in, and relying upon the truth of the statements, representations and contract of defendant, so made as aforesaid, plaintiff did, on or about February 4th, 1922, enter upon his said employment, and the performance of said contract, and faithfully, fairly, fully and completely fulfilled and performed all of the conditions of said contract by plaintiff to be fulfilled and performed, on his part, until defendant, as hereinafter alleged, discharged the plaintiff. That solely by reason of accepting said employment, in and by said contract, as aforesaid, plaintiff has lost the entire value of his interests in said business, to-wit, Reol Productions, Inc., of the value of about $50,000.00, the value of which was known to defendant, its agents and representatives, at the time the contract hereinbefore set forth was made with plaintiff.

"That defendant did, on or about November 24th, 1923, without any complaint having been made against plaintiff

by the defendant, and without any cause whatever, discharge plaintiff from said employment; and defendant has ever since said date refused, and still refuses to allow and permit plaintiff to perform the duties and conditions of said contract on plaintiff's part to be performed.''

In his first cause of action the plaintiff alleges that there is a balance due him, for services rendered at $500 a week, the sum of $33,725. He also alleges therein that, ''by reason of accepting said employment, . . . plaintiff has lost the entire value of his interest in said . . . Reol Productions, Inc., of the value of $50,000.'' The second cause of action is for damages in the sum of $31,000, the amount which he would have earned at $500 a week during the remainder of the term of his employment. The third cause of action is for damages in the sum of $100,000 because of the defendant's failure to deliver the shares of stock agreed upon. The third cause of action also contains the following allegation: ''That defendant, at all of the times herein alleged, has refused and still refuses to purchase a reasonable priced residence for plaintiff, and plaintiff was compelled to, and did, purchase a residence of the value of $15,000.00, on or about the 2nd day of June, 1923, in which sum plaintiff has been damaged, and that no part of said sum has been paid.'' In the fourth cause of action it is alleged that the plaintiff performed said services ''upon the special order and request of said defendant''; that the ''defendant promised to pay to plaintiff the reasonable value thereof,'' that $500 a week is such reasonable value; and that a balance of $33,725 thereof remains due and unpaid.

The answer admits that ''on or about February 4, 1922, this defendant entered into a contract with plaintiff wherein and whereby plaintiff was employed as general manager of studios of the defendant in the said County of Los Angeles, but denies that said employment was for a period of three years . . . or for any other period exceeding a period of one week, and thereafter from week to week, at the option of this defendant,'' and denies that the defendant agreed to pay plaintiff $500 a week ''or any other sum in excess of $150 a week.'' The answer denies the other allegations of the complaint herein quoted, except the averment that plaintiff performed the alleged services, and, as a separate defense, alleges ''that if any contract was ever made or entered into,

as alleged, . . . there was no note or memorandum thereof in writing,'' and that therefore it was invalid. As a third and separate defense, the answer alleges ''that this defendant employed plaintiff as general manager of studios, from week to week, at a salary of $150 a week, plus house rental,'' that the defendant has paid the plaintiff such salary and ''also supplied plaintiff with house rental during said employment.''

The jury returned a general verdict in favor of the plaintiff for $75,000. A special verdict also was returned, by which the jury found, in substance, that the defendant agreed to pay the plaintiff $500 a week for three years; to issue to him shares of stock as alleged in the complaint; to reimburse plaintiff for loss sustained by him ''by the sale and disposal of his household goods and/or personal effects, his interest in said Reol Productions, Inc.; . . . to pay the purchase price of a house of a reasonable value for plaintiff in or about Los Angeles, . . . to be deeded to plaintiff and become plaintiff's sole property''; to reduce the contract to writing; that the plaintiff left his business and employment in New York to accept said employment in Los Angeles and thereby suffered ''loss to his interest in Reol Productions, Inc., and . . . in his personal effects and household goods''; that the plaintiff rendered services under the contract for 94 weeks; that $500 a week is the reasonable value of such services; that $15,000 is a reasonable value for a residence for plaintiff; and that by ''giving up his business in New York and entering the employment of defendant'' the plaintiff sustained a loss of $20,000.

The trial court granted a nonsuit as to plaintiff's claim for damages on account of defendant's failure to deliver the shares of stock alleged to have been agreed upon. The court granted a new trial ''as to the issue that plaintiff has lost the entire value of his interest in said Reol Productions and was thereby damaged in the sum of $20,000 as found by the special verdict of the jury on that issue,'' thereby reducing the amount of plaintiff's recovery to $55,000.

In order that the picture presented by the record may be understood it is necessary to describe the actors who have principal parts therein. At all times material to the questions raised by the appeal there were three corporations, all governed by ''practically the same officers and the same

directors'' and occupying the same offices in New York City. The R-C Pictures Corporation was the parent company and the others were subsidiary corporations, the defendant being the picture producing company and the Robertson-Cole Distributing Corporation the distributing company. Grahams of London was a copartnership, not incorporated. The copartnership had various business interests in this country and owned all of the capital stock of the corporations named. Sir Erskine Crum was its business representative. He was ''one of the London people of Grahams who usually handled the American accounts.''

His particular authority to act for Grahams was not shown, but in the name of Grahams he executed a contract with Patrick A. Powers, hereinafter referred to, by which the latter was made the general manager of the three corporations, and which contract was carried into effect by such corporations. Crum authorized Powers to promise the delivery of a certain number of shares of Grahams' stock to some of the employees of the corporations as additional compensation. Powers accordingly promised stock to plaintiff and two other employees, named Berman and Schnitzer. Under date of April 30, 1922, in a letter to Schnitzer, Crum stated: ''I write this on leaving for England to put on record the arrangements made with Mr. Powers for your interests in the R-C Pictures Corporation. Out of the 40,000 shares of treasury stock in the corporation of B common stock, 10,000 shares of the par value of $10 each will be retained for you to be handed to you as follows'': The letter then proceeds to state the terms upon which shares of stock will be delivered to Schnitzer from time to time as preferred stock is retired. Powers testified that he was present at a meeting of the board of directors of the R-C Pictures Corporation in the fall of 1923 when H. C. S. Thomson presented to the board for approval contracts ''entered into between Schnitzer and the Grahams and Mr. Berman and the Grahams,'' by the terms of which Schnitzer and Berman were to receive more shares of stock than had been promised them. The foregoing evidence tends to show that Crum had actual authority to enter into contracts in behalf of Grahams and, since it was peculiarly within the power of the defendant to show with certainty the extent of Crum's authority and no evidence was offered to rebut

the inference to be drawn from such evidence, the reasonable conclusion is that his acts were duly authorized. At the time the plaintiff was employed the directors of the defendant corporation were Sir Erskine Crum, J. P. Kennedy, W. W. Lancaster, Rufus S. Cole, and R. J. Tobin. Cole was president of the corporation and continued in that office until May 16, 1922, when he resigned, both as director and president, and Powers was elected to succeed him as managing director. Prior to that time, on the 17th of February, 1922, Powers had been elected managing director of the R-C Pictures Corporation. Tobin resigned as a director of defendant corporation March 10, 1922, and H. C. S. Thomson was elected to fill the vacancy. Thomson was chairman of the board of directors of the R-C Pictures Corporation from August, 1921, to October or November, 1923. He then became managing director in place of Powers.

Grahams had invested large sums of money in the moving picture enterprises of the corporations named and was receiving no returns therefrom. Powers was a man of affairs, with a wide experience in the moving picture industry. After various negotiations between Crum and Powers during January, 1922, a written agreement was executed on the fourth day of February, 1922, by Grahams as party of the first part and Powers as party of the second part, Crum executing the agreement as attorney-in-fact of Grahams. Relative to this agreement, Powers testified: "I entered into an agreement with Crum, on behalf of the Grahams & Company of London, England, who were the entire owners . . . of the R-C Pictures Corporation and its subsidiary companies, to take over the management of the business." Thomson testified that such agreement was the contract by which Powers was employed and the agreement was offered in evidence by the defendant, but plaintiff's objection to its admission was sustained. The agreement is set forth at length in the record and there is nothing therein that could possibly strengthen the defendant's case. February 17, 1922, R-C Pictures Corporation amended its by-laws by creating the office of managing director and providing: "The managing director shall exercise general supervision of the business affairs and property of the corporation. He shall have the power and authority, subject at all times to the board of directors, to supervise the conduct, management and general

policy of the corporation. . . . He shall consult and confer with the chairman of the board of the corporation upon any plan or action of substantial importance to be taken in connection with the affairs of the corporation and shall take no action of such character and shall have no power to bind, permit or otherwise involve the corporation in an amount in any way exceeding five thousand dollars or to transfer or convey any of its property without first consulting with and receiving the approval of the chairman thereto." On the same day the board of directors, as shown by the minutes, elected Powers "to the office of managing director of this corporation, to serve without compensation, in accordance with the provision of the by-laws. The vote in favor of the foregoing resolution was as follows: In favor: Sir Erskine Crum, W. W. Lancaster, H. C. S. Thomson; Oppose: Rufus S. Cole." The subsidiary corporations appear to have taken the same steps toward the amendment of their by-laws and the appointment of Powers as managing director.

During the month of January, 1922, Powers and the plaintiff arrived at an understanding to the effect that the plaintiff was to perform certain services in New York and then take charge of the defendant's studio in Los Angeles as general manager thereof. February 4, 1922, Crum, Powers, and the plaintiff reached an understanding as to the terms of plaintiff's employment. Relative thereto, the plaintiff testified: "Mr. Powers said I would receive $500 a week from the company with a certain amount of stock to be set aside for myself; . . . that any losses I may sustain in leaving my own business in New York would be borne by the company, . . . would be reimbursed by the company; that they would supply me with a home here; . . . with a house, and furnish it. . . . He said he would buy a home and furnish it for me. . . . Sir Erskine Crum said . . . that all the terms Mr. Powers had just explained to him were perfectly satisfactory to him, that it was up to Mr. Powers who was managing director, who had charge of everything; . . . that all the terms of the agreement would be put in writing as soon as possible. . . . They asked me, Sir Erskine Crum and Mr. Powers, to immediately start with the work of reorganization of the R-C Pictures Corporation and its subsidiary companies. . . . Sir Erskine Crum told me two or three times, he says, 'We have millions at stake and the

greatest leakage is in Los Angeles and . . . to go over there and stop it as soon as possible''; that about the middle of February Crum said, "You have got to go, time is the essence of everything, we are losing thousands of dollars every week; . . . never worry, go ahead and we will take care of you." The plaintiff left New York for Los Angeles on the 23d of the same month. Cole, who was then president of the defendant corporation, and Powers accompanied plaintiff on the trip. Testimony was introduced to the effect that, during the journey to Los Angeles, all the terms of plaintiff's employment were explained to Cole. Powers' testimony relative to the terms of plaintiff's employment were substantially the same as that of the plaintiff except that Powers did not remember that anything was said in Crum's presence about buying a house for plaintiff. Crum died before the trial. Plaintiff was paid $150 a week for the services performed by him. He testified that in the aforesaid conversation in New York Crum told him to draw as much as he needed up to $500 a week, but that on account of the defendant's need of money it was understood between Cole, Powers, and the plaintiff that the latter "should draw as little as possible." Powers testified that such was the understanding. The defendant paid the expenses of plaintiff and his family in going from New York to Los Angeles and paid the rental of their living quarters at the latter place for seven months at $250 a month. The plaintiff then purchased a residence in Los Angeles for $15,000 and the defendant expended about $3,500 in furnishing it and an additional sum in enlarging the house. Plaintiff testified that he sold his furniture in New York at a loss of about $4,000. He acted as general manager of defendant's studio in Los Angeles until his discharge, without cause as alleged in the complaint. Shortly after his discharge plaintiff commenced this action. No written agreement was entered into by the parties, although the plaintiff frequently asked Powers to cause the agreement to be reduced to writing, and Powers put him off from time to time, promising him, however, to have a written contract executed. Both Cole and Thompson testified that they were never informed of the terms of the oral agreement. It does not appear that plaintiff had any knowledge of the limitations on Powers' authority.

[1]   The trial court granted a new trial as to the issue of damages on account of plaintiff's alleged loss in giving up his business in New York, thus reducing the amount found by the jury to $55,000. The allegations of the complaint in this connection are in substance that the plaintiff was to "dispose of his interest in the Reol Productions" and that the defendant was to reimburse him for any loss sustained thereby. There is neither allegation nor proof that he disposed of such interest and, hence, there is no basis for a recovery on account of any loss thereby. The jury found that the plaintiff was entitled to recover for salary earned and interest thereon, $36,462.01, and on account of the purchase price of a residence the sum of $15,000. Deducting these amounts from $55,000 leaves $3,537.99, which the jury must have awarded for the loss on the sale of the furniture in New York. The complaint does not allege that the plaintiff sustained any loss in the sale of his furniture in New York, or even that he sold the furniture. The judgment, therefore, must be reduced by the amount awarded for such loss.

Plaintiff's uncorroborated testimony that it was orally agreed "that they would supply me with a home here; . . . with a house, and furnish it, . . . would buy a house and furnish it for me," is too indefinite and uncertain to support the finding of the jury that the defendant agreed "to pay the purchase price of a house of a reasonable value, . . . *to be deeded to plaintiff and become plaintiff's sole property.*" In any event, if the defendant was to give the plaintiff a residence in part payment for three years' services, he is not entitled to recover the full value of the residence upon performance of services for only a part of such period of time any more than he would be entitled to recover at the rate of $500 a week for the unexpired term of the employment:.

[2]   In considering the case it must be kept in mind that Grahams was the sole owner of all the capital stock of the corporations involved in the foregoing transactions. "When necessary to redress fraud, protect the rights of third persons, or to prevent a palpable injustice, the law and equity will intervene and cast aside the legal fiction of independent corporate existence, as distinguished from those who hold and own the corporate capital stock, and deal with the cor-

poration and stockholders as identical entities with identical duties and obligations.'' (*Wenban Estate, Inc.,* v. *Hewlett,* 193 Cal. 675, 696 [227 Pac. 723].) **[3]** Also, effect must be given to the fact that at the time of plaintiff's employment and during a part of the time of the performance of his services Cole was president of the defendant corporation and was fully informed of the oral contract under which such services were being performed. ''The president is considered the head of the corporation, and it is his duty to report to the trustees information affecting the interests of the corporation. And the presumption is that he does so. Usually this is a conclusive ·presumption.'' (*Balfour* v. *Fresno Canal & Irr. Co.,* 123 Cal. 395, 397 [55 Pac. 1062, 1063]; *McKenney* v. *Ellsworth,* 165 Cal. 326, 329 [132 Pac. 75].) ''As a corporation can have knowledge only through the information of its officers and agents, the knowledge of such officers within the scope of their duties and employment becomes the knowledge of the corporation.'' (*Montecito Valley Co.* v. *Santa Barbara,* 144 Cal. 578, 597 [77 Pac. 1113, 1120].) It must be presumed, therefore, that the defendant was fully informed of the terms of plaintiff's employment and, with that knowledge, accepted and received the benefit of his services.

**[4]** Admittedly, the agreement between the parties being oral and not to be performed within a year from the making thereof, it is unenforceable under the provisions of section 1624 of the Civil Code and section 1973 of the Code of Civil Procedure. Appellant contends that it is void and ineffective for any purpose. ''It is the general rule, however, that a contract falling within the operation of the statute, but made in contravention thereof, is not invalid in the sense that it is void. It is merely voidable. The statute is said to relate to the remedy only and not to affect the validity of the oral contract.'' (*O'Brien* v. *O'Brien,* 197 Cal. 577 [241 Pac. 861, 864].) In *Producers' Fruit Co.* v. *Goddard,* 75 Cal. App. 737 [243 Pac. 686, 693], Mr. Justice Hart said: ''An agreement not in writing, but which the statute requires shall be in writing to be enforceable, if legally unobjectionable in all other respects, is as effective as to all the purposes for which it has been made as is such an agreement whose terms have been committed to writing until its enforcement is voided upon the ground that it is not in writing.''

There are statements in some decisions in this state, especially the earlier ones, to the effect that a contract within the statute of frauds is void, but an examination of such cases discloses that the word "void" was used therein as synonymous with the word "unenforceable."

[5] Appellant urges that it was error to admit proof of the terms of the oral agreement as evidence of the reasonable value of plaintiff's services. Particular reliance is placed upon *Hanley v. Murphy*, 70 Cal. App. 157 [232 Pac. 767], decided by this court in the year 1924. The invalid contract which was held in that case to be inadmissible in evidence, however, was not offered as proof of the value of the plaintiff's services, but to defeat plaintiff's cause of action, on the ground that such services had been performed under the invalid contract and not as alleged by the plaintiff. The invalid contract provided that the plaintiff was to be compensated by receiving a share of the wool and of the increase of a band of sheep, and it is clear that the terms of the contract would throw no light upon the value of plaintiff's services, in the absence of proof of the value of such wool and increase. Even though an oral contract may be unenforceable, the oral stipulations of the parties as to the compensation to be paid for services rendered under it are in the nature of admissions by them as to the reasonable value of such services and, while not conclusive, are admissible in evidence. In this case the terms of the oral contract constitute the only evidence upon the question of the value of plaintiff's services. In a similar case it is said: "This value, in the absence of any other evidence on the subject, may be fairly assumed at what was stipulated for in the parol contract. Though not binding or conclusive, it may be regarded as admissible evidence for that purpose. Neither party thought fit to adduce any other. . . . As a declaration of the parties, it is entitled to some credence." (*Clark v. United States*, 95 U. S. 539 [24 L. Ed. 518, 519, see, also, Rose's U. S. Notes].) "In an action for services, evidence of the terms of the verbal agreement are admissible to establish . . . the value of the services, it is usually held (citing numerous cases), although there is authority to the contrary." (27 C. J. 380.) While no case in this state has been cited, in which the facts are the same as in this, there are several analogous cases holding that an un-

enforceable contract is admissible in evidence to prove the reasonable value of services performed or materials furnished under the contract. (*Laidlaw* v. *Marye,* 133 Cal. 170, 176 [65 Pac. 391]; *Condon* v. *Donohue,* 160 Cal. 749, 754 [118 Pac. 113]; *Bringham* v. *Knox,* 127 Cal. 40, 44 [59 Pac. 198]; *Joost* v. *Sullivan,* 111 Cal. 286, 296 [43 Pac. 896]; *Booth* v. *Pendola,* 88 Cal. 36, 41 [23 Pac. 200, 25 Pac. 1101]; *Castagnino* v. *Balletta,* 82 Cal. 250 [23 Pac. 127]; *Reynolds* v. *Jourdan,* 6 Cal. 109; *American-Hawaiian Engineering & Const. Co.* v. *Butler,* 17 Cal. App. 764, 770 [121 Pac. 709]; *Naylor* v. *Adams,* 15 Cal. App. 548, 556 [115 Pac. 335].)

Appellant complains of some of the instructions given by the court and of the court's refusal to give certain instructions requested by the defendant. The special verdict, however, is sufficient to support the judgment for $33,725, the largest amount for which the judgment can be affirmed, and since neither the instructions given nor those refused could have influenced the jury in making the special findings which support the verdict and judgment to the extent mentioned, it is unnecessary to consider them further than to say that in the event of a new trial the instructions should be so framed as to permit a recovery on but one of the theories to be hereinafter considered.

[6] If it be determined that the defendant is estopped to deny the validity of the oral contract, then the plaintiff will be entitled to recover the contract price for services performed and, also, such damages, if any, as he has suffered by reason of the defendant's breach thereof, or he may treat the contract as rescinded by such breach and recover the reasonable value of the services performed, but he cannot recover on both theories, or partly on the one and partly on the other. If it finally be determined that the defendant is not estopped, still the plaintiff may recover the reasonable value of the services performed by him. In such case, however, he cannot recover interest upon such reasonable value prior to judgment. (*Swinnerton* v. *Argonaut Land & Dev. Co.,* 112 Cal. 375, 379 [44 Pac. 719]; *Macomber* v. *Bigelow,* 123 Cal. 532, 535 [56 Pac. 449]; *Macomber* v. *Bigelow,* 126 Cal. 9, 14 [58 Pac. 312].) Since it is impossible to determine from the record whether the verdict is based upon the theory of estoppel or upon the implied promise of defendant to pay the reasonable value of the services performed, and

since the evidence is insufficient to establish an estoppel, the award of interest cannot be upheld.

[7]    The only evidence tending to prove an estoppel is that the plaintiff sacrificed his business and his furniture in New York in reliance upon the oral agreement of employment.    At most, the evidence only shows that plaintiff's business became valueless.    It does not appear that it would not have become equally valueless if he had remained in New York, or that it was not conducted, after his departure, by persons as competent as himself.    While there is testimony to the effect that he sustained a loss in the sale of his furniture in New York, the evidence is very unsatisfactory as to what the defendant agreed to do relative to such loss.    The plaintiff's testimony in that connection is of the most general character.    His wife sold the furniture in May, 1922, she having remained in New York up to that time.    She testified that before the sale Powers told her to sell the furniture, to "just sell it and get all you can for it."    "He told me that they would replace my furniture."    The defendant did replace the furniture by paying for other furniture for plaintiff's Los Angeles residence.    There is no other evidence tending to show that the plaintiff sustained any loss by accepting the employment.    There is no presumption that one suffers a loss by changing his place of residence from New York to Los Angeles.    (*Standing* v. *Morosco,* 43 Cal. App. 244 [184 Pac. 954].)

The jury expressly found from the uncontradicted evidence, the admissions of the parties in the oral agreement, that $500 a week is "a reasonable salary or a reasonable value of plaintiff's work and labor per week."    This finding would be sufficient to justify the verdict to that extent upon the theory of estoppel, if an estoppel has been proved.    It is also sufficient upon the theory of an implied contract to pay the reasonable value of such services.    There appears to be no reason, therefore, why the judgment may not stand to the extent of such reasonable value, providing the plaintiff waive his alleged right to recover for the loss of his business and the value of his Los Angeles residence, but if he desires to further prosecute the action for the recovery of the amount of such loss and value, then the whole case should be retried, because the plaintiff is not entitled to recover the reasonable value of his services in one trial, upon

the theory of an implied contract, and upon the terms of the oral contract in another.

It is ordered and adjudged that if the respondent shall, within thirty days after the going down of the *remittitur* herein, file in the trial court a written release of the judgment to the extent of $21,275 and a written consent to the dismissal of all causes of action alleged in the complaint except that for the reasonable value of the alleged services actually performed by the plaintiff, then the judgment shall stand affirmed for the sum of $33,725 and costs in the trial court. If such release and consent be not so filed within said time, then the judgment shall stand reversed. In either case, the appellant to recover costs of appeal.

Hart, J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on December 24, 1926, and, in addition to modifying the opinion to read as above, the following opinion was rendered thereon:

FINCH, P. J.—Appellant has filed a petition for a rehearing in which it is urged that a contract which is unenforceable, because within the statute of frauds, is not admissible in evidence in an action of *quantum meruit* as tending to prove the reasonable value of services rendered. Reliance is placed on the provision of section 1973 of the Code of Civil Procedure, which is herein italicized as follows: "In the following cases the agreement is invalid, unless the same or some note or memorandum thereof be in writing, and subscribed by the party charged, or his agent. *Evidence, therefore, of the agreement, cannot be received without the writing or secondary evidence of its contents:* 1. An agreement that by its terms is not to be performed within a year from the making thereof. . . . " The heading of chapter VI, title II, part IV, in which section 1973 appears is "Indispensable Evidence." The first section in the chapter, 1967, provides: "The law makes certain evidence necessary to the validity of particular acts, or the proof of particular facts." Section 1968 provides that "perjury and treason must be proved by testimony of more than one witness." Section 1969 provides: "A last will and testa-

ment, except a nuncupative will, is invalid, unless it be in writing and executed with such formalities as are required by law. When, therefore, such a will is to be shown, the instrument itself must be produced, or secondary evidence of its contents be given." The evident intent running through the provisions of chapter VI is to specify the "indispensable evidence" which is "necessary to the validity of particular acts, or the proof of particular facts" which are enumerated in that chapter, and not to make such provisions applicable to the proof of other acts or facts. The provision of section 1969, that when "such a will is to be shown, the instrument itself must be produced, or secondary evidence of its contents be given," is similar to the provision of section 1973 upon which appellant relies. An invalid will may be admitted in evidence as a declaration of a decedent in a suit by one named as beneficiary thereunder to recover for services rendered the decedent. (*Estate of Rohrer*, 160 Cal. 574, 576 [Ann. Cas. 1913A, 479, 117 Pac. 672] ; *Mayborne* v. *Citizens Trust & Savings Bank*, 46 Cal. App. 178, 187 [188 Pac. 1034].) "A written statement is none the less competent as an admission because it is contained in a document which is not itself effective for the purpose for which it was made, either by reason of illegality or incompetency of a party thereto." (22 C. J. 307.) If the terms of an ineffective written contract may be proved as admissions, no substantial reason appears for holding that the terms of an ineffective oral contract may not be so proved. In Elliott on Contracts, section 1213, it is said that courts differ as to the construction to be placed on the statute of frauds; that some "always insist on a literal interpretation and application of the statute, regardless of its manifest intent and purpose"; and that others construe the statute "so as to make it apply only in those cases which come within the intent of the statute." The California cases cited herein and those cited in the original opinion show that the courts of this state have adopted the latter rule. It clearly appears from the provisons of chapter VI as a whole, also from the provisions of section 1973 standing alone, that the language upon which appellant relies was not intended to exclude proof of admissions against the interest of a party upon the mere ground that such admissions constitute the terms of an unenforceable contract,

but to exclude such proof when offered for the purpose of establishing the contract in an action to enforce the same. "When the contract is offered as evidence merely and not for the purpose of founding a claim, it may be received." (27 C. J. 379.) In this case proof of the oral contract was admissible, not for the purpose of founding a claim thereon but as constituting an admission by defendant as to the value of the services which plaintiff rendered. Such evidence, as stated, is not conclusive, as it would be if the contract were enforceable. In a case such as this the oral agreement is not the basis of the action, "but evidence of its terms is often necessary to establish the implied contract upon which recovery is sought." (*Baldridge* v. *Centgraf,* 82 Kan. 240 [108 Pac. 83]; *Longhofer* v. *Herbel,* 83 Kan. 278 [111 Pac. 483].) To give section 1973 the meaning attributed to it by appellant would often prevent the establishment of such an implied contract. Appellant relies also on the case of *Fuller* v. *Reed,* 38 Cal. 99, wherein it is said: "Evidence of the value of the land stipulated to be conveyed by the express void agreement is inadmissible as a measure of the value of services rendered by plaintiff. . . . To permit such testimony for the purpose of establishing the reasonable value of services rendered by plaintiff, . . . would, in effect, allow a party in one breath to disaffirm a contract, and in the next to affirm and claim the benefit of the same contract as valid and subsisting, and substantially enable him to recover as for breach of a valid express contract in a simple action as *assumpsit* upon an implied contract." It appears throughout the opinion in that case that the court had in mind the question whether the stipulated compensation in the invalid contract was the measure of the value of the services rendered by the plaintiff rather than the admissibility of the terms of the contract as an admission or declaration of the defendant tending to show such value. That case was decided in 1869, prior to the enactment of section 1973 of the Code of Civil Procedure and section 1624 of the Civil Code. The statute then in force provided: "Every contract for the leasing for a longer period than one year, or for the sale of any lands, or any interest in lands, shall be *void,* unless the contract, or some note or memorandum thereof expressing the consideration, be in writing, and be subscribed by the party by whom the lease of sale is to be made." (Stats.

1850, p. 266.)   The decision in *Dreidlein* v. *Manger*, 69 Mont. 155 [220 Pac. 1107], cited by appellant, is based upon the theory that a contract within the statute of frauds is absolutely void. *Long* v. *Long*, 162 Cal. 427 [122 Pac. 1077], merely holds that part performance of an oral contract does not take it out of the statute of frauds in so far as the contract remains executory.   While unguarded *dicta* to the contrary may appear in some decisions, the courts of this state have uniformly held, since the decision in the case of *In re Balfour & Garette*, 14 Cal. App. 261 [111 Pac. 615], that contracts within the statute of frauds are not void but unenforceable only.   In that case Mr. Justice Hart says: "The original object of the statute was unquestionably to lay down in express terms certain rules by which, only, certain contracts, in themselves perfectly legal and valid, could be proved."   The cases cited in the opinion heretofore filed herein show that the present rule in this state is in harmony with the original object of the statute as stated by Mr. Justice Hart.   If the oral contract is valid, though unenforceable, no logical reason appears why an admission or declaration therein against interest may not be shown as tending to prove some issue in an action which is not upon contract between the parties to the contract.   In discussing a somewhat similar question in *Dupuy* v. *Macleod*, 4 Cal. Unrep. 147, 150 [33 Pac. 1115, 1117], it is said: "A writing to satisfy the statute of frauds is one thing. A writing which is admissible in evidence as to some of the facts of a sale is, or may be, quite a different thing."   If at any time the defendant had made an oral statement as to the value of plaintiff's services, it would have been admissible in evidence against the defendant.   The fact that the oral statement was one of the terms of the unenforceable oral contract does not, on any logical grounds, render it less admissible.

The petition for a rehearing is denied.

Hart, J., concurred.

Plummer, J., concurred in the modification of the opinion, but in his opinion the petition for a rehearing should have been granted.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 24, 1927.